## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Superior Seafoods, Inc.,                                   Civil No. 05-170 (DWF/FLN)
and Superior Seafoods, L.L.C.,

               Plaintiffs,

v.                                                                      **MEMORANDUM**
                                                              **OPINION AND ORDER**
Hanft Fride, P.A., John D. Kelly,
and Mark D. Pilon,

               Defendants.

_____

Marcy S. Wallace, Esq., Cox Goudy McNulty & Wallace, PLLP, counsel for Plaintiffs.

Paul C. Peterson, Esq., Timothy J. O'Connor, Esq., and William L. Davidson, Esq., Lind Jensen Sullivan & Peterson, PA, counsel for Defendants.

_____

## INTRODUCTION

In this action, Plaintiffs assert that Defendants committed legal malpractice by stipulating to a consent judgment in a related action before this Court, *Superior Seafoods, Inc. v. Tyson Foods, Inc.*, Civ. No. 5-96-173 (JRT/RLE) (the "underlying *Kemp v. Tyson* action"). This matter is before the Court on a Motion for Summary Judgment brought by Defendants Hanft Fride, P.A. and John D. Kelly; a Motion for Summary Judgment brought by Defendant Mark D. Pilon; a Motion for Partial Summary Judgment brought by Plaintiffs; and a Motion to Exclude Opinions of Jeffrey Cordray brought by

Defendants.  For the reasons stated below, the Court grants Defendants' motions for summary judgment and denies Plaintiffs' Motion for Partial Summary Judgment.[1]

## BACKGROUND

Plaintiffs Superior Seafoods, Inc., and Superior Seafoods, L.L.C., are companies created by Louis Kemp.  Defendant Hanft Fride, P.A., is a law firm in Minnesota.  Defendant John Kelly is a senior partner at Hanft Fride.  Defendant Mark Pilon is an attorney and shareholder at Hanft Fride.  Hanft Fride, Kelly, and Pilon represented Plaintiff Superior Seafoods, Inc., and Louis Kemp in the underlying *Kemp v. Tyson* action.  In May 2001, Kelly signed a stipulation for a consent judgment in the underlying *Kemp v. Tyson* action.  (Doc. No. 115 in Civ. No. 5-96-173 (JRT/RLE).)  Plaintiffs argue that Defendants gave away Plaintiffs' valuable trademark rights by signing the stipulation.

The factual and litigation history between the parties is long and complex.  The Court provides a detailed summary of the history below.  In 1985, Louis Kemp founded Kemp Foods, Inc., to manufacture and sell surimi, an artificial shellfish product.  (Compl. ¶ 9.)  In 1987, Kemp sold 100% of the capital stock of Kemp Foods, Inc., "a company engaged in the business of processing and marketing surimi based seafood products" to Oscar Mayer.  (Aff. of Paulette S. Sarp ("Sarp Aff.) ¶ 7, Ex. 6 (the "1987 Stock

---

[1]    Because the Court grants Defendants' motions for summary judgment, the Court does not consider Defendants' Motion to Exclude the Opinions of Jeffrey Cordray, Plaintiffs' damages expert, and denies that motion as moot.  The Court did not consider the opinions of Jeffrey Cordray in issuing this Order.

Acquisition Agreement") at 1.)  As part of the 1987 Stock Acquisition Agreement, Oscar

Mayer obtained the rights to all of the trademarks used by Kemp Foods, Inc., including

the trademarks KEMP, KEMP'S, and KEMP'S & Design.  (Sarp. Aff. ¶ 7, Ex. 6

¶¶ 7.1 -7.5.)  The Agreement also provided that:

> Seller [Louis Kemp] agrees that neither Seller [Louis Kemp], nor
> any entity in which Seller [Lois Kemp] has an interest, shall in the
> future market, sell or otherwise distribute any product except as
> provided in Section 7.6 and 7.7 or any other food or beverage
> produce either at wholesale or retail bearing the name KEMP,
> KEMP'S, KEMP'S & Design or any variation thereof.

(*Id.* ¶ 7.5.)  Under Paragraph 7.6, Kemp and his related entities agreed to cease all use of

the KEMP, KEMP'S, and KEMP'S & Design marks within nine months.  Under

Paragraph 7.7, Kemp (and any entity in which he has an interest) was authorized to

market, sell, or distribute certain identified products under a composite mark that

included the KEMP name with advance written approval from Oscar Mayer.  Plaintiffs

never sought such approval.

In the fall of 1987, Oscar Mayer asked Kemp if it could rename Kemp Foods as

the Louis Kemp Seafood Company.  (Aff. of Marcy S. Wallace ("Wallace Aff.") ¶ 2,

Ex. B at 169-70.)  According to the testimony of Louis Kemp, an executive at Oscar

Mayer told Kemp that it would only use LOUIS KEMP on surimi products and that

Kemp could use his name for anything else.  Kemp asserts that he and Oscar Mayer

orally agreed to this arrangement (the "1987 oral agreement").  (*Id*. at 170-73.)

In 1988, Oscar Mayer began using LOUIS KEMP to sell surimi products.  In

1989, the parties amended the 1987 Stock Acquisition Agreement so as to permit Oscar

Mayer to use and register the trademarks LOUIS KEMP and LOUIS KEMP SEAFOOD

COMPANY (the "LOUIS KEMP marks") to market "surimi-based seafood products and

such other seafood and fish accessory products within the natural zone of product line

expansion." (Sarp Aff. ¶ 8, Ex. 7 ("Amendment No. 1").) Amendment No. 1 also

provided that "[e]xcept as hereinabove amended, all other provisions of the [1987 Stock

Acquisition Agreement] shall remain in full force and effect." (*Id*. at 2.) Oscar Mayer

thereafter registered the LOUIS KEMP mark and continued to develop and market

products under the LOUIS KEMP mark. (Sarp Aff. ¶ 10, Ex. 9 (Expert Report of Allen

Hinderaker) at ¶¶ 12-17 & ¶ 11, Ex. 10.) [2] According to the Findings of Fact in the

underlying *Kemp v. Tyson* action, from 1987 to 1991, Tyson (via its Louis Kemp Seafood

Company) spent nearly $50 million in advertising and promoting its products under the

LOUIS KEMP marks. *See Kemp v. Tyson*, Civ. No. 5-96-173, 2002 WL 31185860, at *3

(D. Minn. Sept. 30, 2002).

In 1991, the United States sued Kemp for certain loan guarantees. (Sarp. Aff.

¶¶ 25, 53, Exs. 24, 52.) During that lawsuit, Kemp purportedly sold several assets to

---

[2]    Defendants submit the opinions of two experts in support of their assertion that the consent judgment did not harm plaintiffs. (Sarp Aff. ¶¶ 10, 11 Exs. 9 (Expert Report of Allen Hinderaker) & 38 (Aff. of John P. Passarelli).) Plaintiffs argue that these reports offer nothing more than conclusory legal opinions and are inadmissible. The Court considers the opinions to the extent that they provide evidence of the background history and facts of the present litigation. The Court does not, at this time, pass on whether the expert opinions are otherwise admissible.

Superior Seafoods, Inc., for $10,000, including "[a]ny rights retained by Seller" under the 1987 Stock Acquisition Agreement.  (Sarp. Aff. ¶ 12, Ex. 13; Wallace Aff. ¶ 4, Ex. D.)[3]

In 1992, Oscar Mayer's parent corporation, Kraft Foods, sold its surimi-based seafood business and related trademark rights to Tyson Foods, Inc. ("Tyson").  (Sarp. Aff. ¶ 13, Ex. 12 at ¶ 10 (September 30, 2002 Findings of Fact, Conclusions of Law and Order for Judgment in the underlying *Kemp v. Tyson* action.)  Tyson thereafter sold this business to Bumble Bee Seafoods, Inc.  (*Id.*)  ConAgra Foods later acquired Bumble Bee Seafoods, Inc.  (*Id.*)  ConAgra has since sold the business to Trident Foods.

In August 1995, Kemp and Superior Seafoods, Inc., sued Oscar Mayer, Kraft, and Tyson in California state court.  (Sarp Aff.¶ 16, Ex. 15.)  In the California action, Kemp and Superior Seafoods, Inc., claimed that Oscar Mayer and Kraft had breached the terms of the 1987 Stock Acquisition Agreement when they assigned the LOUIS KEMP marks to Tyson.  Kemp and Superior Seafoods, Inc., also alleged that Tyson misappropriated the LOUIS KEMP marks and violated Kemp's statutory and common law rights to use his name.  The California court granted Tyson's demurrer without leave to amend as to the claims discussed above and subsequently dismissed the remaining claims.  (Sarp Aff. ¶ 17, Ex. 16; Wallace ¶ 12, Ex. L.)  The California court explained that "the defendants

---

[3]     Later, in 2002, Superior Seafoods, Inc., purportedly transferred the rights to use the LOUIS KEMP name in connection with certain non-surimi products to Superior Seafoods, L.L.C., for $100,000.  (Wallace Aff. ¶ 5, Ex. E.)

are using tradenames/marks, which were sold by Kemp to Oscar Mayer." (Sarp Aff. ¶ 17, Ex. 16 at 2.)

In October 1995, while the California action was pending, Quality Finer Foods, a company formed by Kemp, began using the LOUIS KEMP name to sell wild rice, chicken and wild rice soup, and wild rice with stir fry vegetables. *See Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d 1049, 1051 (8th Cir. 2005); *Kemp v. Tyson*, Civ. No. 5-96-173, 2002 WL 31185860, at *3-4 (D. Minn. 2002). In April and May 1995, when Kemp was considering using Louis Kemp in connection with wild rice products, he wrote the following to a prospective business partner:

> Non-fish products can use the "Louis Kemp" brand name which has national recognition with over $50 million spent on advertising, 20 million lbs of "Louis Kemp" product sold annually with a 67% market share of the prepackaged retail market in its category. [April 1995 letter.]

> We could use the "Louis Kemp" brand name where we can and want to, to take advantage of the considerable equity it possesses and or any and all other brands the company can utilize, now and in the future to develop any other specialty food items that would meet the compan[y']s goal for growth and success. [May 1995 letter.]

*Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d at 1051.

In March 1996, Tyson sent Kemp and Quality Finer Foods a letter demanding that they cease and desist from using the LOUIS KEMP trademark, asserting that it created a substantial likelihood of confusion. (Sarp Aff. ¶ 15, Ex. 14.)

In 1996, while the California action was pending, Kemp, Superior Seafoods, Inc., and Quality Finer Foods sued Tyson in Minnesota state court in the underlying *Kemp v. Tyson* action. (Wallace Aff. ¶ 13, Ex. M; Sarp Aff. ¶ 19, Ex. 18.) In the underlying

*Kemp v. Tyson* action, the plaintiffs sought a declaratory judgment determining their rights regarding the use of the name "Louis Kemp."  (*Id*.)  In particular, the plaintiffs sought a declaration that they had the right to use the name "Louis Kemp" on all products other than surimi and certain accessory products.  (*Id*.)  Plaintiffs also alleged that Tyson's use of the LOUIS KEMP trademark was illegal and sought damages for tortious interference and unfair competition.  (*Id*.)  Tyson removed the case to federal court and asserted counterclaims, including a claim seeking a declaration that it was the owner of all right, title, and interest in the LOUIS KEMP marks for use in connection with food and related products.  (Wallace Aff. ¶14, Ex. N; Sarp Aff. ¶ 21, Ex. 20.)[4]

In November 1996, Kemp filed for bankruptcy in California.  (Sarp Aff. ¶ 54, Ex. 53.)  In June 1997, Kemp's bankruptcy trustee sold Kemp's 5% interest in the California and Minnesota litigation to Kraft and Tyson for $137,000.  (Wallace Aff. ¶ 18, Ex. R at 2-3.)  Kemp's trustee agreed to convey to Kraft and Tyson any rights that she or Kemp's estate had to trademarks for LOUIS KEMP and LOUIS KEMP SEAFOOD COMPANY.  (Wallace Ex. ¶ 19, Ex. S at 4-5.)  In February 1998, Kemp's bankruptcy trustee entered into an agreement with Kraft and Tyson wherein Kraft and Tyson would compensate the trustee to recover the rights that Kemp had purportedly transferred to

---

[4]    Hanft Fride did not represent the plaintiffs in the 1995 California action and substituted in as plaintiffs' counsel in the underlying *Kemp v. Tyson* action in August 1996.  (Sarp Aff. ¶ 20, Ex. 19.)  Defendants Kelly and Pilon were attorneys on the file.

Superior Seafoods, Inc.  (Wallace Aff. ¶ 18, Ex. R; Sarp Aff. ¶ 26, Ex. 25.)  The

agreement provided in relevant part:

> 2.7  As part of the consideration for the payment by Kraft the Trustee
> agrees to sell to Kraft and Kraft agrees to purchase, (1) any and all
> additional right, title and interest that the Bankruptcy Estate may acquire or
> reacquire relating to the past, current or future use of the Louis Kemp name
> by Oscar Mayer, Kraft, Tyson or any of their affiliates, transferees,
> successors, designees or assigns; (2) any and all right, title and interest in
> any trademark, tradename or any other right which Kemp purportedly
> transferred to Superior Seafoods and/or Quality Finer Foods; or which
> derived from said transfer; (3) any and all additional right, title and interest
> in claims the Bankruptcy Estate may have relating to the use and
> registration of the tradenames "Louis Kemp" and "Louis Kemp Seafood
> Company."

> 2.8  As part of the consideration for the payment by Kraft the Trustee shall,
> in the event she settles with Kemp, Superior Seafoods, or any other party to
> the Action described in Paragraph 2.5 above or otherwise prevails in the
> Action, convey to Kraft and Tyson or any of their affiliates, designees or
> assigns, any further right, title and interest she may hold on behalf of the
> Bankruptcy Estate of Louis E. Kemp in the use and registration (including
> but not limited to any permission to use she may have), of the names and
> trademarks "Louis Kemp" and "Louis Kemp Seafood Company" as well as
> any other rights transferred by Kemp or which derived therefrom.  Trustee
> shall not oppose entry of the injunction sought by Tyson in its counter
> claims filed in the Minnesota litigation.

(Wallace Aff. ¶ 18, Ex. R at 4-7.)  Also under the agreement, the trustee released Kraft,

Oscar Mayer, and Tyson from all claims "that were brought, or could have been brought"

in the California and Minnesota lawsuits.  (*Id*. at 8.)  Kraft, Oscar Mayer, and Tyson also

released their claims against the trustee and Kemp's bankruptcy estate.  (*Id*.)  The

bankruptcy court approved the settlement in February 1998.  (Sarp Aff. ¶ 27, Ex. 26.)

The trustee commenced an adversary proceeding against Superior Seafoods, Inc., and

Quality Finer Foods to set aside the 1991 transfer of trademark rights as a fraudulent

conveyance.  (Wallace Aff. ¶ 20, Ex. T.)

On May 5, 1998, the Court issued an order suspending the Minnesota litigation

pending resolution of litigation in California.  *Kemp v. Tyson*, 19 F. Supp. 2d 961, 966

(D. Minn. 1998).

In 1999, Kemp's bankruptcy trustee, Kemp, Superior Seafoods, Inc., Quality Finer

Foods and other parties entered into a global settlement of the California litigation.

(Wallace Aff. ¶ 21, Ex. U; Sarp Aff. ¶¶ 28, Ex. 27.)  As part of the settlement, the parties

agreed that the trustee would dismiss with prejudice all claims pending in California and

that Kemp would receive a bankruptcy discharge.  (Wallace ¶¶ 21, Ex. U at 10-11; Sarp

Aff. ¶ 28, Ex. 27 at 10-11.)  In addition, Kemp and Superior Seafoods, Inc., agreed to

"relinquish any and all claims to any portion of any cash or settlement proceeds" the

trustee received in settling with Oscar Mayer and Kraft.  (*Id*. at 11-12.)  The bankruptcy

court approved the settlement in June 1999.

In a separate letter agreement dated March 12, 1999, Kemp, Superior Seafoods,

Inc., Quality Finer Foods, and other parties agreed that:

> 3.  . . . Kraft's sale to Tyson of the rights referenced in Paragraph 7.8 (of
> Amendment No. 1) of the [1987 Stock Acquisition Agreement] in no way
> breached any provision of the Agreement . . . [and] that the trademarks
> Tyson has registered for the names "Louis Kemp" and "Louis Kemp
> Seafood Company" are valid with respect to use only on "surimi-based
> seafood products and such other seafood and fish accessory products within
> the natural zone of product line expansion" . . . .

In addition, the letter agreement provides that:

4.      Kraft agrees that the only rights that it and Oscar Mayer acquired from Louis Kemp with respect to the use of the name "Louis Kemp" were those rights defined in Paragraph 7.8 (of Amendment 1) of the Stock Acquisition Agreement.

5.      Kraft agrees that the only rights it transferred to Tyson with respect to use of the name "Louis Kemp" are the rights that it and Oscar Mayer acquired from Louis Kemp (described in Paragraph 7.8 of Amendment No. 1 to the Agreement), and any rights, if any, that Kraft, Oscar Mayer, or any of their respective subsidiaries acquired by their use of the names "Louis Kemp" and "Louis Kemp Seafood Company" at any time prior to Kraft's transfer to Tyson.

(Wallace Aff. ¶ 23, Ex. W; Sarp Aff. ¶ 30, Ex. 29.)  Kemp and Superior Seafoods, Inc., also agreed to dismiss with prejudice all claims that could have been brought in the California litigation.  (*Id*.)

After the global settlement in the California bankruptcy and state court lawsuits, the stay was lifted in the Minnesota action.  In March 1997, Defendant Kelly advised Kemp that in light of the state court's grant of a demurrer in the California action, most of Kemp's complaint in the Minnesota action would likely be dismissed and advised Kemp that Superior Seafoods, Inc., would likely end up defending an infringement claim asserted by Tyson.  (Sarp Aff. ¶ 48, Ex. 47.)  Kelly further explained that the California state court judge "held that you have no right of recovery from Tyson for its use of your name because Tyson bought the right to do so from Oscar Mayer.  She stated that if Oscar Mayer breached your contract by purporting to sell those rights, then any remedy you have is money damages from Oscar Mayer."  (*Id*.)  Defendants Kelly and Pilon spoke to Kemp about entering a consent judgment to narrow the issues in the Minnesota action.  (Sarp Aff. ¶ 2, Ex. 1 at 89-90.)  Pilon worked with Kemp on numerous revisions

of a proposed consent judgment.  (Sarp Aff. ¶ 49, Ex. 48.)  Negotiations on the consent

judgment failed.

In May 2000, the defendants filed various motions in the underlying *Kemp v.*

*Tyson* action, including a motion to dismiss plaintiffs' claims as precluded or, in the

alternative, to enforce a consent judgment that Tyson claimed had been reached.  (Sarp

Aff. ¶ 33, Ex. 32.)[5]  In December 2000, the Court heard the parties' pending motions,

including various motions for summary judgment.  Prior to the hearing, Kemp agreed to

the terms of a consent judgment.  (Aff. of John D. Kelly ("Kelly Aff.") ¶ 2; Wallace ¶ 55,

Ex. CCC at 3.)  During the hearing on the pending motions, the Court asked counsel for

Tyson if his clients were seeking the right to use the LOUIS KEMP marks on all food

products.  (Wallace Aff.  ¶ 55, Ex. CCC at 21.)  Counsel for Tyson stated, "We are not

seeking the right to use Louie Kemp on all food products."  (*Id*.)  Counsel for Tyson also

indicated that the rights were defined by the California judgment and the consent

judgment.  (*Id*. at 21-22.)

In March 2001, the Court granted Tyson's motion for summary judgment on

plaintiffs' tortious interference and unfair competitions claims and otherwise denied the

---

[5]      In their motion requesting the Court enforce the Consent Judgment, the defendants
claimed that an agreement on a consent judgment had been reached because Pilon signed
a Scheduling Order that indicated that the parties had agreed to an attached Consent
Judgment.  (Sarp Aff. ¶ 33, Ex. 32 at 7.)  Counsel for defendants subsequently sent
counsel for Kemp and Superior Seafoods, Inc., a revised copy of the Consent Judgment
to be executed.  (*Id*. at 8.)  Kemp ultimately refused to sign the Consent Judgment.  (*Id*.)
Kemp claims that he refused to sign the Consent Judgment because it did not contain an
agreed upon surimi limitation.

plaintiffs' and the defendants' motions for summary judgment.  *Kemp v. Tyson,* No. Civ.
96-173,  2001 WL 391552, at *7-8 (D. Minn. Mar. 31, 2001).  In denying the motions for
summary judgment on the parties' dispute over the plaintiffs' alleged contractual rights to
register and use the LOUIS KEMP marks and the defendants' alleged right to prevent
plaintiffs from using the LOUIS KEMP marks, the Court noted that under the parties'
contracts, and in particular the 1987 Stock Acquisition Agreement and Amendment
No. 1, the defendants (Tyson and Bumble Bee) only acquired a limited right to use and
register the LOUIS KEMP marks in connection with surimi-based seafood and related
products.  *Kemp v. Tyson Foods,* No. Civ. 96-173, 2001 WL 391552, at *5.  The Court
also explained, however, that Paragraph 7.8 of the Stock Acquisition Agreement "related
solely to defendants' right to use and register the LOUIS KEMP mark for certain specific
products" and that it "says absolutely nothing about plaintiffs' rights to use the LOUIS
KEMP mark."  (*Id*.)  The Court further stated:

> The Court's holding that plaintiffs did not acquire an affirmative
> contractual right akin to rights acquired under a concurrent use agreement
> means that plaintiffs' use of marks incorporating LOUIS KEMP is subject
> to defendants' claims that:  1) plaintiffs are contractually barred from using
> LOUIS KEMP under separate provisions in the [1987 Stock Acquisition
> Agreement]; and/or 2) plaintiffs' use of a similar mark causes consumer
> [confusion] under standard trademark infringement analysis.

(*Id*., at *5 n.8.)  The Court also required the parties to submit a signed stipulation on the
consent judgment for the Court's signature.

Subsequently, the parties exchanged drafts of a consent judgment.  On
May 3, 2001, Kelly wrote to Kemp indicating that the current draft that was presented to
him for his signature omitted "important limiting language" that specified that Tyson's

rights to the LOUIS KEMP marks were only for surimi and related products.  (Wallace Aff. ¶ 61, Ex. III.)  The next day, Kelly wrote Kemp again to inform Kemp of a conversation that Kelly had with a lawyer for Tyson.  (Wallace Aff. ¶ 62, Ex. JJJ.)  Kelly reported that Tyson's counsel refused to reinstate the surimi limitation because that was conditioned on the signing of a prior stipulation.  (*Id*.)  Kelly further explained that:

> As [Tyson's attorney] points out, however, the registered trademarks are what they are and, as you will recall, they are limited.  Moreover, the terms of the Judge's recent Order makes clear what the limitations on Tyson's rights are.
>
> I have discussed this with [Pilon].  The language in the Stipulation that has been presented to us does not effect any expansion of Tyson's limited rights to use the trademarks in question.  It is the language that was before us when we had our discussion prior to the motion hearing that were held before Judge Tunheim several months ago.  It is the language that I informed the Court we had agreed to.  While I might prefer the somewhat more expansive language, I am satisfied that its absence is not material.

(*Id*.)

On or around May 16, 2001, Kelly signed the stipulation for the consent judgment. In a cover letter to the Court, Kelly stated that the consent judgment was subject to "the Court's determination that the 'defendants acquired only a limited right to use and register LOUIS KEMP and LOUIS KEMP SEAFOOD COMPANY in connection with surimi-based seafood and related products.'"  (Wallace Aff. ¶ 63,  Ex. KKK.)

The Court signed a Stipulation and Order Granting Consent Judgment on May 22, 2001.  The Consent Judgment provides in relevant part:

> 6.      The California litigations have now been resolved by means of a demurrer and grant of summary judgment in favor of Tyson in the California state trial court . . . coupled with a settlement agreement signed by all of the parties to those litigations and the parties to the present

litigation, other than Bumble Bea Seafoods, Inc., which settlement has been approved by the California bankruptcy court.

7.      Pursuant to the doctrine of res judicata, the Court finds that Tyson owns all right, title, and interest in and to the LOUIS KEMP Marks, and Tyson owns U.S. Trademark Registration Nos. 1,859,815 and 1,859,816 (for the mark LOUIS KEMP) and U.S. Trademark Registration Nos. 1,859,817 and 1,879,931 (for the mark LOUIS KEMP SEAFOOD CO.). Accordingly, the Court hereby grants judgment to Tyson on its claim for declaratory judgment (Am. Ans., Aff. Def. & Ctrcls., Ctrcl. ¶¶ 32-36).

8.      Tyson's LOUIS KEMP Marks are valid, enforceable, and in full force and effect.

9.      Based on the findings in paragraphs 7 and 8 above, the Court hereby dismisses with prejudice, pursuant to the doctrine of res judicata, all claims advanced by Kemp against Tyson related to the ownership of the Marks . . .

. . .

11.      Accordingly, the only issues remaining in the present litigation are whether the use by Kemp of the trademark LOUIS KEMP or any formative of this mark in connection with rice products . . . infringes and/or dilutes Tyson's rights in the LOUIS KEMP Marks.

(Sarp Aff. ¶ 35, Ex. 34 at 2-3.)  The Consent Judgment makes no mention of limitations regarding the rights acquired by Tyson and states that the only issues remaining were whether the use of the LOUIS KEMP marks on wild rice products infringed or diluted Tyson's rights.

The Court conducted a bench trial on the remaining issues of whether Kemp and Superior Seafoods, Inc., had infringed or diluted Tyson's rights in the LOUIS KEMP marks.  Prior to the bench trial, the Court heard a motion in limine brought by defendants, wherein defendants argued that, in light of the Consent Judgment, there is no longer a contractual issue before the Court.  *Kemp v. Tyson*, No. Civ. 5-96-173, 2002 WL

31185860, at *5.  The Court granted the motion in limine, thereby eliminating all contract issues based on the Consent Judgment.  The Court reasoned:  "In the Court's view, it was plaintiffs' declaratory judgment claim which provided the basis upon which to determine the parties' contractual rights to the Louis Kemp name.  But that claim was dismissed with prejudice in paragraph 9 of the consent judgment."  *Id*.  The Court further explained that the "only claims remaining before the Court are defendant's claims under federal and state law that Kemp's adoption and use of the LOUIS KEMP mark for a line of wild rice products infringes or dilutes defendant's trademark rights in the same name."  *Id*.

On September 30, 2002, the Court issued its decision—finding under a common law trademark analysis that Kemp's use of the Louis Kemp name in relation to his line of wild rice products did not infringe or dilute the asserted LOUIS KEMP marks.  (*Id.* at 8-9.)  Defendants appealed from the common law trademark ruling.  In February 2005, the Eighth Circuit Court of Appeals reversed the judgment and found that consumer confusion was likely and that Mr. Kemp's use of LOUIS KEMP in connection with wild rice products was infringement.  *See Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d at 1058.

In October 2002, Bumble Bee filed a new trademark application, seeking to register LOUIS KEMP SEAFOOD CO. for use on "[f]rozen, prepared, and refrigerated meals and entrees consisting primarily of seafood or imitation seafood; shellfish; seafood-based dips; and seafood-based cocktails."  (Wallace Aff. ¶ 74,  Ex. VVV.)  In 2003, Bumble

Bee also introduced LOUIS KEMP smoked salmon.[6]  While the appeal of the September 30, 2002 Order was pending, Kemp sought to enjoin Bumble Bee from using the LOUIS KEMP mark in connection with the sale of salmon.  *Kemp v. Tyson*, No. Civ. 96-173, 2004 WL 741590 (D. Minn. Mar. 30, 2004).  The Court denied the motion for injunctive relief, explaining:

> As an initial matter, the Court notes that Kemp's current motion does not allege that Bumble Bee's use of LOUIS KEMP in connection with smoked salmon infringes or otherwise violates a mark held by Kemp. There is no evidence before the Court of any currently registered trademarks held by Kemp involving his name.  Further . . . the bankruptcy trustee administering Kemp's estate sold "any remaining rights, title, and interest . . . in the trademarks Louis Kemp, Louis Kemp Seafood Company . . . Kemp, Kemp's and Kemp's & Design" as well as "any and all additional right, title, and interest . . . relating to the past, current, or future use of the Louis Kemp name."

> Rather, Kemp grounds his request for injunctive relief in this Court's statement in the March 31, 2001 summary judgment order that Oscar Mayer, and any successors in interest, acquired only a limited right to use the marks.  According to Kemp, if Oscar Mayer and its successors in interest acquired only a limited right, then Kemp must have the right to enforce those limits.

> . . .

> Even if Kemp does have some right to challenge Bumble Bee's use of its trademarks, the Court believes that Kemp will be unlikely to succeed on the merits of the claim. The Court found that Oscar Mayer, through its purchase of Kemp's surimi-based product line, acquired only a limited contractual right to register and use the words LOUIS KEMP. *A limited contractual right does not prevent Oscar Mayer and its successors in*

---

[6]   The record demonstrates that Bumble Bee initially launched a smoked salmon line in the spring of 2001.  On or around May 14, 2001, counsel for Superior Seafoods, Inc., sent a cease and desist letter.  The record suggests that Bumble Bee ceased selling salmon under the LOUIS KEMP marks at the end of 2001.  (Wallace Aff. ¶ 71, Ex. SSS.)

> *interest from subsequently expanding that right either contractually or otherwise.* In this case, the Consent Order, which Kemp entered into and this Court signed, affirmatively granted Tyson/Bumble Bee "all rights, title, and interest in and to the LOUIS KEMP marks" and acknowledged that Tyson owns the mark LOUIS KEMP and LOUIS KEMP SEAFOOD CO. The Consent Order dismissed "all claims advanced by Kemp against Tyson related to ownership of the Marks." There are no restrictions placed on Tyson's registration, ownership, or use of the LOUIS KEMP and LOUIS KEMP SEAFOOD CO. marks. This language is unambiguous and simply cannot be read to include the possibility that the scope of Tyson's marks continued to be limited to surimi-based products. If such a limitation was intended, it should have been included in the Consent Order.

*Kemp v. Tyson*, No. Civ. 96-173, 2004 WL 741590, at *4-5 (emphasis added).

On January 27, 2005, plaintiffs filed the present action against Defendants,

alleging negligence and breach of fiduciary duty.[7]

## DISCUSSION

## I.   Motions for Summary Judgment—Legal Standard

Summary judgment is proper if there are no disputed issues of material fact and

the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The

Court must view the evidence and the inferences that may be reasonably drawn from the

evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank

of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated,

---

[7] In June 2006, plaintiffs filed a separate action to set aside the May 22, 2001 Consent Judgment, arguing that it was a product of fraud on the court or was entered by mistake. *See Superior Seafoods, Inc. v. Tyson Foods, Inc.*, Civ. No. 06-2543, 2009 WL 928330 (D. Minn. March 31, 2009). The Court dismissed that action on summary judgment. *Id*. That decision was affirmed on appeal. *Superior Seafoods, Inc. v. Tyson Foods, Inc.*, 620 F.3d 873 (8th Cir. 2010).

"[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.    Malpractice—Claims for Negligence and Breach of Fiduciary Duty Against All Defendants

The elements of a legal malpractice claim are:  "(1) the existence of an attorney-client relationship; (2) acts constituting negligence or breach of contract; (3) that such acts were the proximate cause of the plaintiff's damages; [and] (4) that but for defendant's conduct, the plaintiff would have been successful in the prosecution or defenses of the action." *Jerry's Enters. v. Larkin, Hoffman, Daly & Lindgren, Ltd.*, 711 N.W.2d 811, 816, 819 (Minn. 2006). *See also Admiral Merchant Motor Freight, Inc. v. O'Connor & Hannan*, 494 N.W.2d 261, 265 (Minn. 1992); *Blue Water Corp. v. O'Toole*,

336 N.W.2d 279, 281-82 (Minn. 1983).  Failure to prove any of these elements will defeat a plaintiffs' legal malpractice claim.  *See Jerry's Enters.*, 711 N.W.2d at 816.

In this case, Plaintiffs assert that Defendants are liable for negligence based on their actions in negotiating and signing the 2001 Stipulation for Consent Judgment, and that such negligence harmed Plaintiffs.  Plaintiffs argue that but for Defendants' alleged negligence, Plaintiffs would have used or sold their trademark rights in LOUIS KEMP to sell non-surimi products.  In particular, Plaintiffs assert that prior to the entry of the consent judgment, Plaintiffs had a declaratory judgment claim that they were entitled to use and register the LOUIS KEMP mark on all non-surimi products.  Plaintiffs submit that the consent judgment resulted in the dismissal of that declaratory judgment claim with prejudice and the loss of the surimi limitation on their grant of trademark rights to Defendants.

All parties move for summary judgment on this claim.  Plaintiffs assert that they are entitled to summary judgment that the consent judgment caused the loss of the surimi limitation and the loss of their declaratory judgment claim.  Defendants, on the other hand, argue that Plaintiffs' malpractice claim fails as a matter of law because Plaintiffs cannot establish that the signing of the 2001 Stipulation for Consent Judgment caused harm to Plaintiffs or that Plaintiffs would have achieved a better result but for the alleged attorney negligence.  In particular, Defendants contend that Plaintiffs had no rights to lose at the time of the 2001 Stipulation for Consent Judgment because Plaintiffs never made any lawful use or had any enforceable right in the LOUIS KEMP trademark.

Because Plaintiffs argue that the harm caused them by the Defendants' allegedly negligent actions is that they lost the trademark rights in LOUIS KEMP for the sale of non-surimi products, the Court must consider whether Plaintiffs had trademark rights to lose when the stipulation was signed in 2001.

The basic rule of trademark ownership is priority of use. *First Bank v. First Bank Sys., Inc.*, 84 F.3d 1040, 1044 (8th Cir. 1996) (explaining that common-law trademark arises from actual use); *Allen Homes, Inc. v. Weersing*, 510 F.2d 360, 362 (8th Cir. 1975) ("Trademark rights are conferred by use of the mark."); 2 Thomas J. McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 16:4.  Plaintiffs do not claim (and there is no evidence in the record demonstrating) that Plaintiffs used the LOUIS KEMP trademark in commerce so as to acquire common-law trademark rights for use in connection with non-surimi products.  Nor is there evidence that Plaintiffs successfully registered the LOUIS KEMP trademark for use in connection with the sale of any products.  Instead, Plaintiffs argue that they had rights to the LOUIS KEMP mark through contractual and statutory rights.  Thus, the Court considers whether Plaintiffs indeed had any such rights in 2001.

Plaintiffs do not argue that any party actually conveyed rights to the LOUIS KEMP trademark to Plaintiffs, but appear to argue that Kemp (who purportedly conveyed the rights to Plaintiffs) *retained* the right to use his name on non-surimi food products under the 1987 Stock Acquisition Agreement as amended.  Plaintiffs also contend that pursuant to Kemp's 1987 oral agreement with Oscar Mayer, Plaintiffs had a contractual right to use the name Louis Kemp—and to prevent Oscar Mayer's successors from using

the name Louis Kemp—for goods and services other than surimi-based seafood and certain accessory products.  Plaintiffs argue that by signing the 2001 Stipulation for Consent Judgment, Defendants caused the loss of the surimi limitation that Kemp had retained, as well as their declaratory judgment claim.  Plaintiffs argue that the consent judgment gave away Plaintiffs' substantive rights to use the LOUIS KEMP mark on non-surimi foods because the consent judgment, in effect, expanded Defendants' rights by failing to include the surimi limitation.[8]

The Court concludes that Plaintiffs' argument that it had a contractual right to use the name Louis Kemp for goods and services, except for surimi seafood and certain accessory products, at the time the 2001 Stipulation for Consent Order was signed, fails as a matter of law.  First, the record demonstrates that neither Plaintiffs nor Kemp obtained any rights in the LOUIS KEMP mark via the 1987 Stock Acquisition Agreement.  *See, e.g.*, *Superior Seafoods, Inc. v. Tyson Foods, Inc.*, Civ. No. 06-2543, 2009 WL 928330, at *5 (D. Minn. March 31, 2009).  That agreement conveyed all trademark rights that existed in Kemp's business at the time to Oscar Mayer.  Any discussion in the 1987 Stock Acquisition Agreement of Kemp's trademark rights was related to what Kemp was precluded from doing—i.e., prohibiting Kemp from using any

---

[8]    Plaintiffs also argue that it lost a contract defense to Bumble Bee's appeal to the Eight Circuit Court of Appeals on the common-law infringement claim, a statutory right under the Lanham Act to prevent Oscar Mayer from registering the LOUIS KEMP trademark for non-surimi products, eight live trademark applications, and various oppositions and cancellations pending in the TTAB involving the name Louis Kemp.

KEMP marks, providing that Kemp must cease all use of KEMP within 90 days, and providing that Kemp could not sell products under the KEMP mark (or any variation thereof) without the prior written approval of Oscar Mayer.  Importantly, the 1987 Stock Acquisition Agreement did not place any restrictions on Oscar Mayer's future use or expansion of the use of the KEMP marks or of any future use of LOUIS KEMP. Specifically, it did not restrict Oscar Mayer's ability to develop goodwill in these marks.

Second, Plaintiffs did not obtain any rights in the LOUIS KEMP mark via Amendment No. 1. to the 1987 Stock Acquisition Agreement.  Amendment No. 1 demonstrates that Kemp consented to Oscar Mayer's registration and use of the LOUIS KEMP marks for "surimi-based seafood products and such other seafood and fish accessory products within the natural zone of product line expansion."  (*See* Amendment No. 1.)  However, the fact that Kemp's consent in the Amendment was limited to "surimi-based seafood products and such other seafood and fish accessory products within the natural zone of product line expansion" does not automatically mean that Kemp retained any rights in the LOUIS KEMP mark for non-surimi products.  A party cannot retain rights that it does not have, and Plaintiffs have submitted no evidence to suggest that Kemp could have claimed trademark rights to LOUIS KEMP via use or contract at that time.  Indeed, it is undisputed that Plaintiffs never used the LOUIS KEMP trademark in commerce before Oscar Mayer first used the LOUIS KEMP mark on surimi products in or around 1988.  *See, e.g., Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d at

1057 ("no party enjoyed trademark rights related to the phrase 'LOUIS KEMP' before

Oscar Mayer invested and developed its mark in association with its surimi business").[9]

Third, the 1987 oral agreement does not, as a matter of law, provide any of the

trademark rights that Plaintiffs allege were lost because of Defendants' alleged

malpractice.  Plaintiffs argue that the 1987 oral agreement is the source of its alleged

rights to use the Louis Kemp name for non-surimi products.  However, Amendment

No. 1 to the 1987 Stock Acquisition, wherein Plaintiff consented to Oscar Mayer's

registration and use of the LOUIS KEMP marks for surimi-based products, memorialized

the parties' agreement with respect to the registration of the LOUIS KEMP name.

Amendment No. 1 does not include or mention the rights that Plaintiffs now claim to

have reserved.  *See also Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d at 1050.

Moreover, the 1987 Stock Acquisition Agreement contains an integration clause that

specifically precludes the assertion of any claims of an oral agreement.  (Sarp Aff. ¶ 7,

Ex. 6 at ¶ 16. 5 ("This document contains the entire agreement between the parties hereto

---

[9]     Prior decisions in the underlying litigation between the parties similarly considered and rejected Plaintiffs' argument that they acquired affirmative contractual rights to use the LOUIS KEMP mark for non-surimi products.  *See, e.g., Kemp v. Tyson,* No. Civ. 96-173, 2001 WL 391552, at *5 (explaining that the Court "disagrees with plaintiffs' additional argument that plaintiffs acquired the affirmative contractual right to use LOUIS KEMP in all other respects," that "the plain language of section 7.8 [of the 1987 Stock Acquisition Agreement] simply provides no evidence that the parties intended section 7.8 to service as [a concurrent use] agreement," and that "[s]ection 7.8 relates solely to defendants' right to use and register the LOUIS KEMP mark for certain specific products" and "says absolutely nothing about plaintiffs' rights to use the LOUIS KEMP mark.").

and may not be modified, altered, or changed in any manner except by written agreement between them.").)

Plaintiffs argue that the 1987 oral agreement survived Amendment No. 1 because Amendment No. 1 does not contain an integration clause and does not conflict with Kemp's testimony about the oral agreement.  In support, Plaintiffs rely on Wisconsin law (which governs the contract issues in this case) for the proposition that parol evidence is admissible to show whether the parties intended to assent to the writing as the final and complete statement of their agreement.  This argument fails.  Here, by its terms the 1987 Stock Acquisition Agreement could only be modified by written agreement between the parties.  The parties did modify the agreement in writing via Amendment No. 1.  Amendment No. 1 also provided that all other provisions of the 1987 Stock Acquisition Agreement shall remain in effect.  This included the integration clause.  Here, the parties expressed their intent that the 1987 Stock Acquisition Agreement was fully integrated and that modifications must be in writing.  Thus, Plaintiffs attempt to modify the terms of the 1987 Stock Acquisition Agreement via the alleged oral contract fails.  Therefore, the 1987 oral agreement cannot give rise to any enforceable trademark rights in favor of Kemp.[10]  Moreover, even if the 1987 oral agreement were valid, Plaintiffs have made no showing that it could be the source of trademark rights because, as discussed above, there

---

[10]     Plaintiffs argue that they are entitled to a summary judgment that the alleged 1987 oral agreement between Kemp and Oscar Mayer was valid and enforceable.  In light of the Court's ruling above, Plaintiffs' motion on this issue is denied.

is no evidence that Plaintiffs owned any trademark rights in the LOUIS KEMP marks at that time.

Finally, the Court concludes that Plaintiffs cannot establish that they had statutory rights to the LOUIS KEMP mark.  Plaintiffs argue that it had trademark rights under the Lanham Act.  In particular, Plaintiffs cite to 15 U.S.C. § 1052(c), which provides in relevant part:

> No trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it--
>
> **. . .**
>
> **(c)** Consists of or comprises a name, portrait, or signature identifying a particular living individual except by his written consent, or the name, signature, or portrait of a deceased President of the United States during the life of his widow, if any, except by the written consent of the widow.

15 U.S.C. § 1502(c) ("Section 2(c) of the Lanham Act").  Section 2(c), however, only applies to a person who will be associated with the goods marketed under his name because that person is so well known that the public will assume an association or because that person is publicly connected with the business in which the mark is being used.  *See Gilbert/Robinson, Inc. v. Carrie Beverage-Missouri, Inc*., 989 F.2d 985, 989 (8th Cir. 1993).  *See also* McCarthy § 13:37 (citing Trademark Manual of Examining Procedure § 1206.03 (1986 rev.)).  Plaintiffs have not pointed to any record evidence that creates a factual issue as to whether Section 2(c) of the Lanham Act would apply to Kemp.  Indeed, the Court has already indicated that Kemp would be unlikely to prevail on a claim under Section 2(c).  *See Kemp v. Tyson*, No. Civ. 96-173, 2004 WL 741590, at

*10-11.  Even if Kemp is entitled to protections under Section 2(c), Plaintiffs have made

no showing that this section would have entitled Kemp to prevent Tyson and its related

entities from using the LOUIS KEMP mark.  Section 2(c) might bar registration of a

mark, but it does not necessarily follow that use of the underlying name is prohibited.

*See* McCarthy § 13:37.  Plaintiffs have not demonstrated that this statutory provision

affirmatively grants trademark rights.

Viewing the record in the light most favorable to Plaintiffs, the Court concludes

that Kemp could not have retained rights to use the LOUIS KEMP mark at the time of the

alleged malpractice in 2001.  It is clear from the record that Kemp did not affirmatively

retain the right to use LOUIS KEMP in the 1987 Stock Acquisition Agreement,

Amendment No. 1, or in the alleged 1987 oral agreement.  Moreover, the record

establishes that Quality Finer Foods (a Kemp company) did not begin using the LOUIS

KEMP mark until 1995 in connection with the sale of wild rice products.  That use was

determined by the Eighth Circuit Court of Appeals to be confusingly similar to Oscar

Mayer's use of its LOUIS KEMP mark.  Finally, no reasonable juror could conclude that

Plaintiffs had any enforceable statutory rights in the LOUIS KEMP marks.  Because the

Court determines that Plaintiffs did not possess any trademark rights to the LOUIS

KEMP marks at the time the stipulation for a consent judgment was signed in 2001, the

signing of the stipulation did not, as a matter of law, cause Plaintiffs harm.  Thus, the

Court concludes that Plaintiffs' inability to use the LOUIS KEMP mark does not stem

from Kelly's signing of the 2001 stipulation and that the signing of the stipulation did not

cause Plaintiffs' alleged loss.[11]  For these reasons, Plaintiffs' claims against Defendants

are properly dismissed in their entirety.[12]

## III.   Additional Motions

Defendants argue that Superior Seafoods, L.L.C.'s, claims against them must be

dismissed because Superior Seafoods, L.L.C., never had an attorney-client relationship

with Defendants.  Defendants point to the fact that Superior Seafoods, L.L.C., never

entered into a retainer agreement with Defendants, never paid (and were never billed) for

any legal work, and never requested that Defendants perform legal services.  In addition,

---

[11]     Defendants argue, in the alternative, that even if Kemp somehow retained or obtained trademark rights in LOUIS KEMP, Plaintiffs' claims still fail as a matter of law because Kemp failed to validly transfer those rights, and the rights to the LOUIS KEMP were adjudicated against Kemp and Superior Seafoods, Inc., in the California litigation. Because the Court has concluded Plaintiffs did not have any enforceable rights in the LOUIS KEMP marks, the Court need not and does not reach Defendants' alternative arguments.  Further, the Court need not and does not reach Defendants' arguments that Plaintiffs' damages claim should be rejected because it is speculative or Plaintiffs' argument that the 2001 Consent Judgment would have been vacated if Defendants had brought a motion to vacate under Fed. R. Civ. P. 60(b).

[12]     Plaintiffs argue that they are entitled to summary judgment in their favor on any affirmative defenses or causation issues that were not raised by Defendants in the underlying case, including the defenses of fraudulent transfer, res judicata, transfer in gross, that Kemp never had trademark rights in LOUIS KEMP because he had not used his name as a trademark, and that Kemp could not have enforced the contractual surimi limitation because he is not a celebrity.  However, the record demonstrates that the issue of whether the Plaintiffs had any rights to lose and whether Kemp was a celebrity were raised in the underlying action.  Accordingly, at a minimum, the issue of whether Plaintiffs had any trademark rights in LOUIS KEMP is properly before the Court.  In addition, without deciding the issue, the Court is very skeptical of Plaintiffs' argument that Defendants are precluded from asserting arguments and defenses that were not expressly asserted in the underlying action in defending against the present malpractice claims.

Defendants submit Kemp did not create Superior Seafoods, L.L.C., until October of 2002, more than a year after the alleged malpractice occurred in 2001.

In addition, Defendant Mark D. Pilon moves separately for summary judgment.  In his motion, he relies on the facts and arguments made in the separate memorandum supporting Hanft Fride and Kelly's motion for summary judgment, but also argues that he is entitled to summary judgment on Plaintiffs' malpractice claims because he did not sign the stipulation for the consent judgment on which Plaintiffs base their malpractice claim.

Based on the record before it, the Court seriously doubts that Superior Seafoods, L.L.C., can validly assert a legal malpractice claim against Defendants or that Plaintiffs can maintain their claims against Pilon.  Even so, the Court declines to reach these separate issues because the Court has already ruled that Plaintiffs' claims against Defendants are properly dismissed in their entirety on their merits.

## CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons set forth above, **IT IS ORDERED** that:

1.     Defendants Hanft Fride, P.A., and John D. Kelly's Motion for Summary Judgment (Doc. No. [163]) is **GRANTED.**

2.     Defendant Mark D. Pilon's Motion for Summary Judgment (Doc. No. [160]) is **GRANTED**.

3.     Plaintiffs' Motion for Partial Summary Judgment (Doc. No. [153]) is **DENIED.**

4.      Defendants' Motion to Exclude the Opinions of Jeffrey Cordray (Doc.

No. [157]) is **DENIED AS MOOT**.

5.      Plaintiffs' Complaint (Doc. No. [1]) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  June 3, 2011                         s/Donovan W. Frank
                                             DONOVAN W. FRANK
                                             United States District Judge